## DECLARATION

I, Jason Giannelli, being duly sworn, declare and state as follows:

1.    I am a Special Agent of the Food and Drug Administration – Office of Criminal Investigations ("FDA-OCI") and have been so employed since August 2007. I am a law enforcement officer of the United States, in that I am empowered under the authority of the FDCA to conduct investigations and to make arrests. In my capacity as a Special Agent of the FDA-OCI, I have received extensive training in, among other things, investigations of counterfeit drugs, drug misbranding, drug diversion, drug adulteration, and drug tampering.

2.    Prior to my employment with FDA/OCI, I was a Special Agent with the United States Drug Enforcement Administration ("DEA") from October 1998 to August 2007. Prior to my employment as a DEA Special Agent, I was a Patrol Agent with the United States Border Patrol from May 1996 to October 1998.

3.    This Declaration is submitted in support of the Verified Complaint for Forfeiture in rem against the Real Property that was used to facilitate the distribution of controlled substances, in violation of 21 U.S.C. §§ 841 and 846 and is subject to forfeiture pursuant to 21 U.S.C. § 881 (a)(7). The Real Property is located at 1430 Wilmar Avenue, Merritt Island, Florida (hereafter referred to as the "DEFENDANT PROPERTY"). The DEFENDANT PROPERTY is legally described as Lot 31, SUNNY-SITES UNIT 1, according to the plat thereof as recorded in Plat Book 11, Page 65, Public Records of Brevard County, Florida.

### BACKGROUND ON DRUG INVESTIGATIONS INVOLVING THE SHIPMENT OF DRUGS AND DRUG PROCEEDS THROUGH THE U.S. MAILS

4.    I have participated in the debriefing of numerous defendants, informants, and witnesses who had personal knowledge regarding large-scale illegal drug trafficking organizations and money laundering.  I have participated in all aspects of

1

illegal drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, and executing arrests.  I have received extensive specialized training in the field of illegal drugs and money laundering identification, investigation, and enforcement.

5.      Additionally, I know based on my training and experience as well as working collaboratively with the United States Postal Inspection Service ("USPIS"), illegal foreign drugs are being smuggled into and distributed in the United States from foreign countries to coconspirators who are actively working for an extraterritorial source(s) of supply (hereafter referred to as "SOS"). These coconspirators are commonly referred to as domestic shippers or re-mailers (hereafter referred to as only "domestic shippers").

6.      The domestic shipper oftentimes receives bulk illicit drugs from the SOS and stores those illicit drugs on behalf of the SOS at their residences or places used by them. When receiving an order of illicit drugs from a domestic customer, the SOS oftentimes directs the domestic shipper to process the large quantities of illicit drugs into a smaller quantity and ship the smaller quantity to the ultimate recipient/customer of the SOS. The domestic shipper is oftentimes paid to conduct this service either in monetary remuneration or in a quantity of illicit drugs. In my experiences, the domestic shipper and the SOS oftentimes communicate via email and in Short Message Services ("SMS") such as WhatsApp. The communications from the SOS to the domestic shipper oftentimes dictate the recipient/customer's name, order quantity and type of illicit drugs, and physical address to where the illegal drugs are to be shipped.

7.      I know from my training and experience and from Postal Inspector Richard Atwood that the USPS Express Mail and Priority Mail are frequently utilized by illegal drug traffickers for shipping drugs and drug proceeds. Use of Express Mail

2

and Priority Mail are favored because of their speed, reliability, and tracking service, as well as the perceived minimal chance of detection.

## LEGAL BACKGROUND

8.      Under the Food and Drug Cosmetic Act ("FDCA"), the term "drug" includes articles which are intended (1) for use in the diagnosis, cure, mitigation, treatment, or prevention of diseases in man or (2) to affect the structure or any function of the body of man. 21 U.S.C. §§ 321(g)(1)(B) and (C).

9.      Under the FDCA, the term "new drug" includes any drug that is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof.  21 U.S.C. § 321(p)(1).

10.     With limited exceptions not applicable here, unless the Food and Drug Administration ("FDA") has approved a new drug application or an abbreviated new drug application, drugs are unapproved new drugs and cannot lawfully be introduced or delivered for introduction into interstate commerce. 21 U.S.C. § 355(a). Under 21 U.S.C. § 331(d), it is illegal to introduce, or deliver for introduction, into interstate commerce any unapproved new drug, or to cause the introduction or delivery for introduction into interstate commerce of any unapproved new drug.

11.     Under the FDCA, "interstate commerce" includes commerce between any State and any place outside of that State. 21 U.S.C. § 321(b).

12.     Under the FDCA, certain drugs, because of their toxicity or other potential harmful effects, are not considered safe for use except under the supervision of a practitioner licensed by law to administer such a drug. Those drugs, as well as drugs approved by FDA for use only under the supervision of a licensed practitioner, are known as prescription drugs. 21 U.S.C. § 353(b)(1).

3

13. Prescription drugs may be dispensed only upon the prescription of a licensed practitioner. 21 U.S.C. § 353(b)(1). Dispensing a prescription drug without the prescription of a licensed practitioner causes a drug to be "misbranded." Id. Under 21 U.S.C. § 331(a), it is illegal to introduce or deliver for introduction into interstate commerce a misbranded drug, or to cause the introduction or delivery for introduction into interstate commerce of a misbranded drug.

14. The FDCA imposes strict-liability misdemeanor punishment for violations of 21 U.S.C. §§ 331(a) and 331(d). 21 U.S.C. § 333(a)(1); United States v. Park, 421 U.S. 658 (1975). The FDCA imposes felony punishment if the violation is committed with the "intent to defraud or mislead." 21 U.S.C. § 333(a)(2).

15. Certain drugs are also classified as "controlled substances" under the Controlled Substances Act ("CSA") and are subject to regulation under that statute. "Schedule II" controlled substances, as defined by statute, include drugs determined to have accepted medical use in treatment in the U.S. and the abuse of which may lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2). "Schedule IV" controlled substances, as defined by statute, include drugs determined to also have a medical use in treatment in the U.S. and abuse may lead to limited physical dependence or psychological dependence. 21 U.S.C. § 812(b)(4).

16. The CSA contains its own prohibition on dispensing of prescription drugs that are also Schedule II controlled substances except upon the prescription of a licensed practitioner. 21 U.S.C. § 829(a). Additionally, Schedule II controlled substances cannot be distributed or generally handled in the course of being distributed other than by persons and entities registered with the United States Drug Enforcement Administration.  21 U.S.C. § 822.

17. It is a crime to manufacture, distribute, dispense or possess with intent to distribute controlled substances, or to conspire to do the same, unless authorized by the CSA and its regulations. 21 U.S.C. §§ 841(a) and 846.

18. Knowingly or intentionally delivering, distributing, or dispensing a controlled substance by means of the internet by an online pharmacy that is not validly registered to engage in such internet activity is a crime. 21 U.S.C. § 841(h)(1).

**SUMMARY OF PROBABLE CAUSE**

19. Since approximately June of 2024, the USPIS, FDA-OCI, and DEA have been investigating the mailings of parcels from suspected domestic shippers to residents in the District of Rhode Island. These parcels have been found to contain illegal misbranded and unapproved drugs, including controlled substances.

20. On or about July 2024, Ryder Ellefson (hereinafter referred to as "ELLEFSON"), born in May 1976, was identified as a domestic shipper and coconspirator for an illegal online pharmaceutical network. In furtherance of a criminal conspiracy, ELLEFSON has been mailing packages containing illegal drugs including controlled substances to multiple areas of the United States to include the District of Rhode Island. The packages are sent from the Cocoa and Merritt Island, Florida area via USPS. ELLEFSON is the owner and sole resident of DEFENDANT PROPERTY.

21. I know from Postal Inspector Richard Atwood, in July 2024, he received a mail watch notification of a parcel that was shipped from Cocoa, Florida to a resident of Jamestown, RI (herein referred to as "JS") destined for her PO Box located at the Jamestown Post Office. The return address on the parcel was indicated as, "Tropic Cargo 660 S. Industry Rd Cocoa, FL 32926."

22. A review of USPS databases revealed the parcel was shipped from the Five Points Post Office, located at 1114 Lake Drive, Cocoa, Florida 32922, and the mailer paid for the postage with cash.

23. On July 25, 2024, PI Atwood and DEA agents contacted JS and her husband (herein referred to as "DS") regarding the parcel. JS invited agents into her home and was willing to discuss the issues with the parcels. At the start of the conversation, agents showed JS the parcel and asked her for her consent to open it. JS

5

consented and upon opening the parcel, they discovered six blister packs of fifteen tablets each (total of ninety tablets) labeled as alprazolam manufactured in India and unapproved by the Food and Drug Administration for use in the United States. Alprazolam is a Schedule IV controlled substance. The contents were turned over to DEAs Northeast Regional Laboratory for further analysis and was subsequently confirmed as alprazolam.

24.    In November 2024, PI Atwood received a mail watch notification of another parcel that originated from Cocoa, FL, which was destined for the husband of JS at their residence in Jamestown. The sender's information was again labeled as, "Tropic Cargo 660 S. Industry Rd Cocoa, FL 32926."

25.    A review of USPS databases revealed the parcel was shipped from the Five Points Post Office, located at 1114 Lake Drive, Cocoa, Florida, and the mailer paid for the postage with cash.

26.    On November 14, 2024, PI Richard Atwood and PI Michael Maccarone searched the parcel with consent and discovered six blister packs labeled as "Alprazolam 1 mg," each containing 15 tablets, for a total of 90 tablets. Alprazolam is a Schedule IV controlled substance. The contents were turned over to DEAs Northeast Regional Laboratory for further analysis and was subsequently confirmed as alprazolam.

27.    A third parcel destined for JS that was shipped from Cocoa, FL in November 2024.  As in the previous two parcels, the return address was indicated as, "Tropic Cargo 660 S. Industry Rd Cocoa, FL 32926."

28.    On February 24, 2025, PI Atwood and Postal Inspector Michael Maccarone discovered, wrapped in brown paper, six blister packs marked as "Alprazolam 1 mg," each containing fifteen tablets, for a total of ninety tablets. The contents were turned over to DEAs Northeast Regional Laboratory for further analysis and was subsequently confirmed as alprazolam.

6

29.     PI Atwood continued to monitor parcels shipped from the Cocoa, FL 32922 area to residents in Rhode Island.  In May 2025, PI Atwood discovered a fourth parcel shipped from Cocoa, FL 32922, however, this time it was destined for a woman in Wakefield, RI. The return address on the parcel was again indicated as, "Tropic Cargo 660 S. Industry Rd Cocoa, FL 32926."

30.     On May 9, 2025, the Honorable Patricia A. Sullivan, Magistrate Judge for the District of Rhode Island, issued a federal search warrant, Case No.: 25-SW-148 for the parcel.  On May 12, 2025, PI Atwood and PI Michael Maccarone executed the search warrant on and discovered eighteen blister packs of Tapentadol Tablet 100 mg, manufactured in India and unapproved for use in the United States. Each blister pack had ten round orange pills for a total of 180 tablets. Tapentadol is a schedule II-controlled substance. The contents were turned over to the USPIS Forensic Laboratory for further analysis and was subsequently confirmed as Tapentadol.

31.     In July 2025, PI Atwood and I spoke to the woman in Wakefield, RI (herein referred to as "AD") about the parcel as well as others she has received.  AD stated she has been receiving pain medications from various mailers.  AD stated the pills have been commonly coming in from India.  AD stated she ordered the pills via an online website.

32.     In August 2025, PI Atwood queried USPS databases for shipments of parcels, particularly Priority Mail Small Flat Rate Boxes, paid for in cash, shipped out of the Cocoa, FL 32922 area (the Five Points Post Office) between May 1, 2025, through August 14, 2025.  PI Atwood discovered approximately 300 parcels shipped during the time period on nearly a daily basis.  Upon further review of USPS databases, PI Atwood located images of those parcels, which listed the return sender information as, "Tropic Cargo 660 S. Industry Road Cocoa, FL 32926." These parcels were shipped to nearly every state in the United States.

## SURVEILLANCE OPERATION – WEEK OF AUGUST 18, 2025

33.    During the week of August 18, 2025, Postal Inspectors initiated surveillance at the Five Points Post Office, located at 1114 Lake Drive, Cocoa, Florida. On August 19, 2025, at approximately 3:50 pm, Inspectors observed a blue/grey four (4) door Toyota Avalon, bearing a Florida license plate 83DIDR (herein referred to as the "SUBJECT VEHICLE"), registered to ELLEFSON at the DEFENDANT PROPERTY, pull into the Five Points Post Office, parking lot.

34.    Inspectors observed a heavy-set, white male exit the SUBJECT VEHICLE and enter the post office. Inspector Maccarone entered the post office and observed the heavy-set, white male conduct a cash transaction at the counter. After the heavy-set, white male departed the post office, Inspector Maccarone visually observed the two USPS Priority Small Flat Rate Box mailers to addresses in Minnesota and North Carolina.  The return address was indicated as, "Tropic Cargo 660 S. Industry Road Cocoa, FL 32926."

35.    Then, PI Atwood obtained a copy of ELLEFSON's Florida driver's license and confirmed the heavy-set, white male observed in the Five Points Post Office was in fact ELLEFSON.

36.    On August 20, 2025, PI Atwood and PI Maccarone continued surveillance operations at the Five Points Post Office. At approximately 4:15 pm, Inspectors observed the SUBJECT VEHICLE pull into the Five Points Post Office's parking lot. Postal Inspectors observed ELLEFSON exit the SUBJECT VEHICLE, from the driver's side holding a USPS Priority Small Flat Rate Box and proceed into the post office.

37.    Shortly after, PI Atwood entered the post office and observed ELLEFSON as he conducted the retail transaction and paid cash for the postage. After ELLEFSON departed the post office, PI Atwood reviewed the mailing that indicated the return address as, "Tropic Cargo 660 S. Industry Road Cocoa, FL 32926." The destination address was in Mississippi.

8

38.    Postal Inspectors then surveilled ELLEFSON, after he departed the post office in the SUBJECT VEHICLE and followed ELLEFSON until he returned to the DEFENDANT PROPERTY.

39.    Since the surveillance of ELLEFSON in August 2025, PI Atwood continued to monitor mailings of parcels, particularly Priority Mail Small Flat Rate Boxes, paid for in cash, shipped out of Cocoa, FL 32922 area (the Five Points Post Office) from August 21, 2025, through mid-February 2026.  PI Atwood discovered approximately 300 parcels shipped during the time period on nearly a daily basis. Upon further review of USPS databases, PI Atwood located images of those parcels, which listed the return sender information as, "Tropic Cargo 660 S. Industry Road Cocoa, FL 32926."

**SURVEILLANCE OPERATION – WEEK OF APRIL 13, 2026**

40.    On April 14, 2026, at approximately 2 pm, agents of the USPIS FDA-OCI, DEA, FBI, HSI, and initiated physical surveillance on ELLEFSON. At approximately 2:30 pm, members of the surveillance team located the SUBJECT VEHICLE, at Sunshine Welding, located at 760 Mullet Road, Cape Canaveral, FL. At approximately 3 pm, agents observed ELLEFSON leaving Sunshine Welding and followed him to the DEFENDANT PROPERTY.

41.    At around 3:14 pm, ELLEFSON was observed leaving the DEFENDANT PROPERTY carrying a black plastic shopping bag. ELLEFSON entered the SUBJECT VEHICLE and left his neighborhood. Members of the surveillance team followed ELLEFSON until he stopped at the Five Points Post Office, located at 1114 Lake Drive, Cocoa, Florida, 32922, at approximately 3:30 pm. Members of the surveillance team observed ELLEFSON exiting the SUBJECT VEHICLE carrying two (2) boxes. ELLEFSON then entered the post office.

42.     PI Atwood and I were inside this post office and observed ELLEFSON, on camera pay cash for the postage on the two (2) parcels. ELLEFSON then left the post office. PI Atwood then reviewed the parcels, which were stamped with the same return address: "Tropic Cargo 660 S. Industry Road Cocoa, FL 32926." The destination addresses were in South Carolina and Bronx, New York.  PI Atwood detained one of the Priority Mail Parcels addressed to an individual in the Bronx, New York.

43.     On April 15, 2026, at approximately 1:50 pm, physical surveillance was initiated by members of the surveillance team on ELLEFSON. Again, the SUBJECT VEHICLE was observed at ELLEFSON's place of employment, Sunshine Welding. At 2:55 pm, ELLEFSON was observed leaving his place of employment and traveling directly back to the DEFENDANT PROPERTY.

44.     At 3:42 pm, ELLEFSON left the DEFENDANT PROPERTY, in the SUBJECT VEHICLE, which was parked directly in front of his residence. ELLEFSON exited his neighborhood and was followed by the surveillance team, stopping at a Chevron gas station, nearby. ELLEFSON was only at the gas station for a few minutes, then left, still driving the SUBJECT VEHICLE.  Members of the surveillance team continued to follow him until he stopped at the Five Points Post Office, at approximately 4:05 pm. ELLEFSON was observed walking into the post office.

45.     PI Atwood was inside the post office and observed ELLEFSON pay cash for postage on three (3) packages. At approximately 4:13 pm, ELLEFSON left the post office and began traveling in the direction of his residence. At that time, surveillance was terminated. PI then reviewed the parcels, which were stamped with the same return address, "Tropic Cargo 660 S. Industry Road Cocoa, FL 32926." The destination addresses were in Illinois, Wisconsin, and Michigan.  PI Atwood detained the Michigan parcel and the details of that parcel are as follows:

46.     On April 27, 2026, the Honorable Nathan W. Hill, Magistrate Judge for the Middle District of Florida, authorized search warrants (see case nos.: 6:26-MJ-1506 and

6:26-MJ-1507) for the two parcels seized by PI Atwood on April 14, 2026 and April 15, 2026. Both parcels contained quantities of pills embossed with "2090" on one side and "V" on the other, which are indicative of alprazolam.

## SEARCH WARRANT EXECUTION AT DEFENDANT PROPERTY

47.     On May 8, 2026, Magistrate Judge Robert M. Norway in the United States Middle District of Florida issued a search warrant for the DEFENDANT PROPERTY (Case No. 6:26-mj-1555). On May 12, 2026, agents of USPIS, FDA-OCI, DEA, Federal Bureau of Investigation (FBI), Homeland Security Investigations (HSI) and other law enforcement executed the warrant without incident. ELLEFSON was initially detained while the DEFENDANT PROPERTY was cleared. After the property was cleared, I advised ELLEFSON repeatedly that he was not being detained and was free to leave at any time. ELLEFSON elected to come into the DEFENDANT PROPERTY and speak with agents. A search of the DEFENDANT PROPERTY revealed a large volume of illicit drug evidence including but not limited to unapproved and misbranded schedule IV-controlled substances such as clonazepam, alprazolam, and diazepam.

48.     Ellefson consented to cooperate and answer questions. ELLEFSON admitted that he has been receiving and domestically shipping illegal drugs for the last five years including receiving and storing controlled substances at the DEFENDANT PROPERTY.

## CONCLUSION

49.     Based on the foregoing, there is probable cause to believe or otherwise legally sufficient cause to believe that the DEFENDANT PROPERTY described above was used to facilitate the distribution of controlled substances, in violation of 21 U.S.C. § 841 and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, and therefore the DEFENDANT PROPERTY is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(7).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

JASON GIANNELLI

Dated: July 15, 2026

JASON GIANNELLI
Special Agent
Food and Drug Administration
Office of Criminal Investigations